Case number 21-1018 et al. State of California et al. Petitioners v. Environmental Protection Agency. Mr. McFarland for the petitioners, Ms. Coleman for the respondents, Ms. Berman for the interviewees. Hey, please look forward. Pedro McCombs for the state petitioners. With me at the table is Sarah Burt for the environmental petitioners. I'll be presenting arguments for both. I'd like to reserve five minutes for rebuttal. In 2016, EPA determined that climate change driven by greenhouse gas pollution, including pollution from aircraft, represents an extraordinarily severe threat. Nevertheless, adopting the 2021 aircraft rule, EPA refused to even consider adopting aircraft greenhouse gas emission standards that would reduce these emissions by any amount. EPA expressly refused to consider the climate change impacts that show the need for greater than zero emission reduction, stating, We do not address in this rule the potential environmental or other impacts requiring reduced airplane emissions beyond adopting the ICAO CO2 standards. ICAO being the International Aviation Organization. EPA confined its technology review to validating the ICAO standards, which it found had no cost, no benefit. EPA restricted its analysis to standards that required no improvement from the industry at all. So the question before this court, having acknowledged the points you have just made, was the agency's explanation of what it did here reasonable and supported by the factual assertions it made? And haven't we already decided that question in the National Association, the NACAA case of this court? No, Your Honor. NACAA actually supports our statutory arguments. That's not a statutory argument. I'm trying to decide here. Well, as for our arbitrary and capricious argument. No, no, no. Understand what I'm saying is that the agencies have an obligation to follow the law. But the Supreme Court and this court have long recognized that the agency can also offer an explanation as to what it is doing in response to objections that have been raised, much less to what the statute says. And the question before the court is not whether the agency could do nothing other than confess error and stop the ongoing rulemaking proceeding. That is not what the Supreme Court has held. It's not what our court has held. And so don't we have to, even assuming the truth of what you say as to what the statute requires, whether or not what the agency did here was nevertheless legally permissible. I'll put it that way, because of the explanations it gave for why it proceeded to promulgate the rule as it was, stating that there were reasons to go forward in its view now with the idea that work had to be done so they could catch up later. I mean, I'm just trying to focus on what is the issue before this court. So even when the agency is explaining its reasons, it still has to consider important aspects of the problem. It still has to consider obvious alternatives. What I'm saying, though, Mr. McCombs, is yes, but here when the agency offers an explanation as to what information it would require in order to do the exact examination you state is required. The agency is acknowledging this later promulgation. So it's not denying it, it's simply saying we're not in a position to act on that now. And don't we have to decide whether that was a permissible course of action for the agency. Yes, and I think there are a few tools that this court would have to decide that question. One is, is that explanation of return capricious under the state farm standard? I think the other would be, you know, is explaining why one didn't consider the statutory factors a substitute for considering the statutory factors? I think the answer is no to that. In your view, what did the agency have to do here? Where it acknowledged it didn't have the information it required, that the latest reduction was promulgated fairly recently, and it needed more time. The agency, what, just had to stop the ongoing rulemaking proceeding? No, the agency had plenty of time to conduct the analysis that we urged it to. Well, the agency responded that it needed more time, apparently, than you suggested, because a couple of months wasn't enough. But that doesn't hold up on the record, Your Honor. In 2017 was when the ICAO adopted its standards. The proposal didn't come out until 2020, and in that three-year time period, EPA did conduct a technology review with a very sophisticated model. It conducted its alternative analysis, but it chose to restrict those analyses to simply validating the ICAO standards instead of looking at what could feasible technology actually produce in terms of emission reductions. But the agency said, in order to make that type of determination, we need some other information, and we either have to stop ongoing proceeding or remain out of partial full compliance for a longer period. Two responses, Judge Rogers. The first is that the agency has been developing a record, or it's been collecting information, at least, on these technologies and measures for aircraft since 2008. So it's been gathering information for 12 years before this rulemaking was initiated. Second, the deadline that EPA is citing doesn't hold up on the record either, because the soonest any aircraft we know of needs to be certified to these ICAO standards is 2028. There are no new-type aircraft on the horizon that need to be certified to the new-type standard. Only the in-production standard is to present that disruption effect that EPA is worried about. And so what do you do about that? Well, in the eight years that were between 2020 and 2028, EPA could have studied obvious alternatives like emission-reducing. It left the entire range of emission-reducing alternatives from zero to 100 percent emission reductions completely unexamined. We suggested in the record that a standard that's 10 to 20 percent more stringent than ICAO's top stringency level would be an obvious alternative from the face of the record. EPA left all of that unexamined. One follow-up quickly. What do we do with both the Supreme Court and this court's precedent that gives great deference under the statutory language here to the administrator and the agency's determination on these technical matters? Two points, Judge Rodgers. First, the agency certainly does enjoy a great deal of discretion over these technical matters. But that discretion has to be reasonable. It has to reflect the record. And it has to be exercised in accordance with the Congress's priorities in the statute. So it has to be exercised with the statutory factors. EPA did not do that here. Well, but you have basically to say to the administrator, we don't believe you when you say you need more time to examine the cost effects. Correct. The record states otherwise very clearly. Moreover, this court has stated on many occasions that even a time crunch or a perceived time pressure doesn't justify an arbitrary rulemaking. It doesn't justify skipping over the statutes that Congress specified in Section 231. That's what EPA did here. Maybe in part in relation to Judge Rodgers' question, Section 231 is extremely open-ended delegation to the administrator. That may pose problems of its own. But this court in the NAACAA case has explicitly rejected the idea that Section 231 requires a technology forcing approach, which is what the petitioners argue is required here. So I guess I'm just not sure how your statutory argument can be squared with what was specifically decided in our earlier case interpreting this very provision. Certainly, Judge Rowley. So NAACAA stands for the proposition which EPA put forward in that case that Section 231 requires it to identify a reasonable balance, specified emission reduction, cost, safety, noise, and other factors. EPA takes the opposite position here, that Section 231 requires no particular factors to consider. That's not correct on the basis of the statute. That's contrary to the position it took in that case. Doesn't the rule here read very much like the rule in the NAACAA case? I mean, in terms of how it considered those other factors? It recognizes that there are other factors, but that adopting the ICAO standards serves certain important goals for the EPA and maybe for the government at large. There's an important difference between what EPA did in the 2005 nitrogen oxides rule. That was at issue in NAACAA. There, it considered the statutory factors alongside this harmonization interest, the importance of ICAO standards. What EPA has done here is effectively supplanted Section 231 factors with its harmonization interest preceded solely on that basis. That's not allowed. NAACAA stands for the proposition that you can add to the statutory factors with these other important known statutory interests. What are the factors that are in 231? I mean, there don't seem to be any factors that are in the statute itself. They're certainly not listed very, you know, they're not listed out in bullet points, but if you look at... Are they listed at all? I mean... Yeah, so if taking the first fact, the danger of the emissions at issue, that appears in A1, A2, and A3 where Congress is saying, you know, EPA should understand what are the impacts of these aircraft pollutants and it should regulate the danger, dangerous ones. This court has held that that kind of endangerment trigger is not just procedural activation, it's also a policy guardrail. The feasibility factor appears in A1 and B where it says EPA needs to give enough lead time so that aircraft manufacturers can develop and apply the requisite technology. It can't do that analysis without understanding what is the technology that needs to be applied in order to achieve this emission standard. The noise and the safety factors, those are under A2, B2. The lead time and cost factors are under subsection B. So reading the statute as a whole, as we do, those are certainly the priorities that Congress set forward in the statute. And EPA has interpreted very similar language in section 202 to do the same thing. It says, you know, a very similar lead time provision in section 202 obligates us to study technological feasibility. Here, EPA did not do that. It said we did not develop a record on these technologies. We did not gather the data. We did not conduct the analysis, even though it had been gathering information on these technologies since 2008. To that point, is this essentially a placeholder rule in the sense that you're basically adapting to international standards but there would be other statutory factors? I'm sorry, Judge Childs. Or considerations? Assuming that there was some sort of first-in-kind benefit or table-setting benefit to these standards, EPA was still obligated to consider whether it could achieve those benefits as well as emission reductions, as it has in every prior first-in-kind greenhouse gas rule. The power sector and vehicles have always been able to inaugurate a greenhouse gas emissions regulation program with very real emission reduction benefits. They could have done so here as well. The record shows that even current aircraft in the air are outperforming these standards on a scale of decades. And yet it didn't even look at that. Your main argument requires us to reject the government's interest in harmonization in a way. I disagree, Judge Rao. Harmonization can certainly play a role in these standards. What it can't do is to plant the approach that Congress enacted into law. In the NACA case, for example, it cited George E. Warren Corp., which is a great example of how to do this, where the EPA was addressing both the statutory objective of cleaning up the air with this formulated gas emission program. It also had to comply with the WTO ruling striking down this rule. And so there you had a statutory objective and an important non-statutory interest. EPA was able to design the program so that it achieved both. That could be one approach, right? I mean, is it an approach that the agency has to take? I mean, why is it unreasonable for them to suggest that harmonization is important, you know, for all of its various goals and the role that it played in setting these standards with ICAO? It certainly can say that harmonization is important, but it still has to ground its approach in the statutory factors or in the priorities that Congress put in Section 231 alongside the harmonization interest. That comes from this court's decision in NRDC v. EPA, when it says that EPA has to proceed on rationales grounded in the text and cannot proceed on rationales divorced from the statutory text. But it also comes from the independent anchor owner case, where Judge Bork pointed out that you can have these non-statutory goals, but you can't pursue them to the exclusion of the objectives in the statute. Here, that's what EPA did. The objective of the statute is to reduce dangerous pollution. EPA literally did not consider doing that. But can these be addressed later in upcoming rules? No, Judge Childs, because the rule has to be judged on the record before the court, and it has to stand up on its own right. It's too speculative to say, we can get to this later. In NACA, that's essentially the argument that EPA was making. This court never reached that argument because the petitioners had forfeited their arbitrary and capricious arguments. It turned out that EPA took another seven years to adopt that rule that it was just around the corner from adopting. So it really is too remote and speculative to say, they'll do a better job next time. We have to judge the job they've done this time, according to the standards of Congress and the arbitrary and capricious standard. And you would say the information was available, but then they would say they didn't have enough time, and so they explained their rationale as to why they didn't look at certain data and other information. Yeah, I think the reasonable explanation is not the right tool to look at the records here, because they still need to consider important aspects of the problem. They still need to consider obvious alternatives. No one disputes that the threat of climate change and the means of reducing aviation's contribution to climate change are the central aspects of the regulatory problem. And yet EPA concedes it considered neither. It expressly did not consider the environmental impacts, showing the need for greater than zero emission reductions. It did not develop a record on the technologies and measures it had been studying since 2008. All of that goes to show, instead it just turned away from that evidence and tied itself to the ICAO standards. And that crosses the line of reasonableness. I'll reserve the balance of my time for rebuttal before it has any more questions. Okay, thank you. Good morning, Your Honors. May it please the Court, my name is Chloe Coleman on behalf of the United States Environmental Protection Agency. With me at counsel's table is Agency Counsel Rosemary Caban and Intervenor Counsel Amanda Berman. This case concerns the first-ever EPA regulation to limit greenhouse gases from aircraft. And as you've heard from petitioners, EPA has inaugurated this control effort by adopting a new regulation, the Greenhouse Gas Emission Reduction Standards that the United States negotiated at the international level that fits into law the industry's pre-existing efforts to reduce aircraft emissions of greenhouse gases. And before I get into greater detail, I want to highlight in two broad strokes why we don't think petitioners' claims of unlawfulness and unreasonableness are valid. As to lawfulness, we think that question is answered by this Court's consideration of Section 231 describing the National Association of Clean Air Agencies case, also known as NACA. There, the Court reviewed a nearly identical rulemaking addressing nitrogen oxides and concluded that EPA's adoption of a standard that would not reduce emissions beyond what aircraft were already accomplishing and that instead, aligned domestic requirements with international cooperative standards was lawful under the Clean Air Act because the discretion granted EPA to set appropriate standards under Section 231 is both explicit and extraordinarily broad. Ms. Coleman, can you explain a little bit more about why harmonization was so important to the EPA as opposed to considering ways to exceed the ICAO standards? I mean, ICAO requires the United States to meet those standards. Why is harmonization more important than perhaps trying to exceed those standards? Well, Your Honor, I think the first, you know, element here is that these are the first ever standards, right? We're inaugurating a program and we're dealing with a global industry and we're dealing with a global pollutant. And so when EPA is trying to determine sort of where is the right place to start here, you know, we're looking in particular at the fact that there's an international regime that's trying to set these standards, and not just for the United States, but for the entire world. We have aircraft, obviously, that are crossing borders every day, every hour of every day, frankly. And so making sure that domestic and international obligations make sense together is something EPA takes very seriously. That goes to why it should be the minimum standard. It doesn't go to why EPA shouldn't try to, you know, to exceed those standards, right? Especially when aircraft, you know, according to petitioners in the United States  We recognize that, Your Honor. But I think this is, you know, this is a circumstance that has a number of additional layers to it. One is that we know that demand growth in the industry is going to be increasingly coming from nations outside of the United States. So it's especially important here to be thinking about sort of what EPA is doing on the international stage. And as to the specific question of why EPA felt like exceeding the standards might actually interrupt that process, you know, ICAO works in these sort of three-year cycles, Committee on Environmental Work does. And so we have a new cycle that's going on right now. And that will be issuing new greenhouse gas standards for 2025. And EPA understood when it was adopting these standards that there was a genuine risk in sort of, you know, being the primary lead negotiator of these standards on the one hand and then immediately abandoning them on the other. And so there was a concern here about EPA's credibility in that international process if we were going to walk away from the very standards that we drove ourselves and negotiated between 2009 and 2017 in quite a lengthy effort. So, you know, I think the concern here about exceeding the standards at least at this point in time, where we're really trying to get this program off the ground and where we're trying to make sure that, you know, we're taking account both of what's happening nationally, but also internationally. EPA made its judgment call that as a participant in these negotiations, which are often, as you can see, very lengthy, very challenging, that it was important for EPA to be able to stand there with credibility and say, we are pushing these standards. So this is sort of a unitary executive, you know, we're trying to harmonize our diplomatic and international efforts with our domestic efforts. Yeah, Your Honor, I think that's true. And it's, you know, very particular, I think, you know, in this industry where those global effects, you know, are being felt by an industry that's competing globally. You know, what we're doing in those negotiations, what ICAO is doing is, you know, redounding very specifically to what the industry is doing. And certainly Intervenor Council can speak to that. And as I mentioned, we have a global pollutant here. So considering, you know, sort of the global picture and what we're managing to achieve on a global stage is especially important. I don't understand your response, though, in one sense. I don't think Petitioner's Council is really disputing that. At least that's my understanding. I mean, this is a global issue. There are lots of complicated considerations. But the reasons that EPA gave for not addressing certain of the statutory factors don't withstand scrutiny here because this is not something that EPA just started to study. It's been studying this for years. It's got a lot of data. And how can the agency just say, well, you know, we're going to postpone this further for harmonization. Harmonization has always been there. I don't understand petitioners to question that at all, but rather that at least under the statute that gives the administrators this very, very broad discretion. There are certain limits. And the administrator couldn't say, for example, you know, I've been working hard for five days, so I'm not going to work on this anymore for another five days. Rather, it has to look at the statutory factors and tell us why. As to those particular factors, its judgment is it cannot go forward now on addressing this most recent reduction in the global standard. Well, Your Honor, I would like to make the point first that we don't agree with petitioners primary arguments as to lawfulness here, that there are specific factors that EPA has to weigh in a particular way. And so when we're talking about, you know, what was really the standard by which EPA should be judged here, we think it's reasonableness. We don't think it's lawfulness. And we think that NACA decides that. With respect to the reasonableness of EPA's consideration here, as you mentioned, timing is a major concern. You know, these standards came out in 2017 from ICAO, and there are real consequences to the United States if we don't get a compliant rule in place. U.S. aircraft can be banned from international airspace if we fall out of step with ICAO. So the timing consideration here is quite significant in terms of what sort of the downside risk is. But counsel, what I'm trying to get you to focus on, and I understand why you may not want to, but I need to be clear that you understand my question, is you've been working, or not you, but the agency has been working to respond to these initial standards, and the international standards keep getting stricter. And so EPA says, well, we can handle, based on our current research and examination, the international standards up to this last increase. As to the last increase, the agency says, because this is so complicated, et cetera, for all the reasons you say, we need some more time. And the environmental petitioners are saying, maybe you do need more time, but in order to justify that, you have to look at the statutory factors and tell us why the data you have simply isn't sufficient. And I was posing to counsel, well, why haven't they done that sufficiently? And you're saying they don't need to do it. And I just, that's like two ships passing in the night, and I just want to see how you respond to environmental and intervenors argument. Yes, Your Honor, I think one important clarification here is there hasn't been an updated standard that EPA hasn't adopted. That was the case in NACA, but it's not the case here. At this point in time, there's only one international standard that ICAO has put out for greenhouse gases, and that's the 2017 standard. So there isn't sort of a secondary record at the international level that we haven't considered. What environmental counsel is trying to get us to do is expand our scope of examination into the wide world of infinite other options here that aren't included in the ICAO standard and that haven't yet been adopted in another ICAO standard, although as our brief mentions, we do think an updated standard is coming. And with respect to those record, whether the record could support EPA's examination on this timeframe of those considerations, we think it's very clear from the record that we could not do so in time for this rule. There are a host of other technologies that are available, but they're not necessarily available for all regulated aircraft. And EPA is trying to set a rule here that applies to the industry at large. And so the question of whether EPA had adequate data to actually go ahead and make cost and feasibility determinations with respect to this much broader scope of technologies, we think it's very clear the agency didn't have that time to do that here. And I would note that some of those technologies, some of the things in Petitioner's Briefs, raise really complicated questions. EPA is an unusual position in this part of the Clean Air Act because it has the authority to set the standard, but it doesn't have the authority to enforce the standard. And so all of the enforcement that happens, even of this 231 standard, happens through FAA and its certification processes and its other regulators. And so when you're talking about something like operational standards, Petitioner's Brief mentions the idea that EPA could reduce emissions by eliminating layovers, which I'm sure we'd all appreciate, or changing how taxing and takeoff are done. These are things that fall outside of what EPA can actually enforce. Those are things FAA would have to go do. Ms. Coleman, let me ask you, has EPA ever deviated from ICAO standards for other pollutants, or does EPA always meet ICAO standards? Does it ever go above or below the ICAO standards? There have been instances since the sort of start of ICAO standard setting in the 1980s, but for the past 25 years, EPA has been very consistent in adopting ICAO standards and in putting those at the fore. So then what about Petitioner's argument that this is a kind of impermissible delegation to a UN agency of standards? So if EPA is just simply following ICAO standards, is that a problem? Or why isn't it a problem? I assume you don't think it's a problem. No, Your Honor, we don't. EPA performed its own analysis here. There's a technical support document. There were alternatives considered. EPA is going through its own process to make sure that it ground truths everything that's happening at the international level. I think it's also important to recognize that EPA is the primary driver of this sort of thing. So it's not as if it's sort of a shadowy room full of people and the United States doesn't have a role in that. We're really the primary participant in that. So we're doing it at both levels internationally and domestically, but there is a separate analysis in this record with respect to the cost, with respect to the feasibility. And I think that's an important moment to correct the record as to one thing that Petitioner said with respect to NACA, which is that the rule there considered factors alongside harmonization. Consider things like emission reduction. And if you actually look at the rule under consideration there, and this is mentioned also in the court's NACA opinion at 1225, the court understood that there was no alternative analysis performed there. EPA did not even consider whether it should set a more stringent standard. It did not consider whether getting additional reductions there would have been valuable. And the court still did not find that a problem. Here we actually have an alternatives analysis.  that was highlighted in the NACA rulemaking to look at what those reductions would be from these different alternatives and then supported while this was the reasonable alternative. I see that my time has run. So in conclusion, Your Honors, we would just mention that we dispute Petitioner's assertion that this rule does nothing to advance the aims of the Clean Air Act or to ensure the aircraft industry is addressing its contributions to climate change. These standards have had the support of EPA for decades, and with these standards, EPA has laid a foundation here that regulates this pollution for the first time to make legally enforceable the significant steps the industry has taken to make planes cleaner, and that positions EPA to continue to fight for international action reducing aircraft emissions, not just in the United States, but around the world. As EPA's inaugural rule and its program to control greenhouse gas emissions from aircraft, I would like to introduce Amanda Berman. Good morning, Your Honors. Amanda Berman for Interveners Boeing and the Aerospace Industries Association of America. Today, I'd like to focus on three points that are key from Interveners' perspective. The first is the unique need for international harmony in this particular industry. And to be honest, Your Honors, I'm not going to say much about that because I think that was very robustly covered by EPA counsel, and we've talked a lot about harmony. The second point is the competitive arm that would result if the international economy and U.S. standards were, in fact, more stringent than the international standard. And the third is why it would be very problematic to even require EPA to consider technology forcing standards or standards based on changes in aircraft design or operation. So starting with that second point, because international harmony has been so robustly covered, EPA very reasonably considered the unique history of this particular industry and the market and the competitive arm that would result from more stringent standards as compared to what applies to our international competitors. No other industry has such a strong economic incentive to reduce emissions, and no other industry has a similar history of doing so. Every new generation of aircraft has been more efficient than the last. EPA noted in both the response to comments and the TSD, and you can see this at Joint Appendix Pages 51 and 119, that the cumulative fuel efficiency improvement of the in-service fleet was almost 40 percent between 2000 and 2019 alone. And that was the baseline from which EPA was acting here, a baseline not of static emissions or increasing emissions, but a baseline of continual improvement. And locking that very significant progress in place is not the thing that petitioners are trying to make it out to be. So are your arguments all going to the idea that EPA's decision here was reasonable? Yes, absolutely, Your Honors. And I can address the statutory arguments as well, although I do think they are addressed by the court's decision and so I was going to focus on the arbitrary and capricious. And my point is that EPA didn't just consider international harmonization. It also noted the competitive arm that would result if there were a more stringent domestic standard. And I would, you know, I can point the court to Joint Appendix Pages 3 and 22 on that. Boeing and other U.S. manufacturers, we are competing one-on-one with aircraft made in Europe and in China. If the standards were the increasing stringency, the 10 percent that petitioners mentioned here today, the next Boeing plane on the chopping block would be the 737-9 MAX. And that competes against the Chinese aircraft, the Comus C-919, which is less fuel efficient. Now, under the Chicago Convention, the U.S. can't impose a more stringent domestic standard against aircraft made abroad, even if they're flying in U.S. airspace. So buyers would have this incentive to avoid the extra costs associated with more efficient U.S.  a cheaper foreign-made product that already is less fuel efficient. So not only are we talking about U.S. manufacturers losing business, but we're talking about lost sales that could in fact equate to an overall increase in greenhouse gas emissions. And I also want to note, Your Honors, that as we explained to EPA when it was promulgating the rule, this rule actually does have a very real impact on Boeing. It's going to put two of our planes out of production, the 767 freighter and the 777, earlier than they otherwise would have left production by 2028, even though right now sales of these are popular aircraft and sales are ongoing. So it does in fact have a very real impact. What about its determination that there were no costs and no benefits to the rule? Sure, Your Honor. I think it's important to keep in mind that, again, EPA's baseline in saying that there were going to be no benefits was this assumption of continual improvement at the same rate that we've seen historically. So that's what EPA was measuring against. And we did explain to EPA that there are going to be costs to us. You know, EPA in responding said that it didn't have enough data to verify those. The possibility of getting an FAA exemption, which is a process that is still pretty far away here. So we do disagree with EPA on that point, but there's absolutely no costs because there are costs, at least to Boeing. Your Honors, I also want to point out that it would be very problematic to even require EPA to consider technology forcing standards or standards that are based on changes to design and operation. First off, as we pointed out in our brief, there's an obvious safety issue with technology forcing standards or some of these alternatives that they're throwing out. For example, using only one engine as you're taxing to take off. If that one engine fails as you're then taking off, there's a real potentially catastrophic problem there. So EPA recognized, and you can see this at Joint Appendix page 22, that safety is uniquely the foundation of this particular Clean Air Act regulatory program. And it mentioned that, it said that in response to petitioners' comments that the rule should be technology forcing. So it's not that EPA ignored the safety factor as they have asserted in their brief, and I think I heard that again today. The other reason this is really problematic is that the broad approach that petitioners are advocating encroaches on the FAA's authority. The FAA, not EPA, that has primary authority over and expertise in design, operation, and safety of aircraft. That's why it's the FAA that implements any EPA standards risk certification process, and that's why it's the FAA that had the lead in the ICAO process with EPA serving as an advisor. EPA, in contrast, in Section 231, has a much more limited authority to regulate emissions from aircraft engines. We would thus submit that EPA, frankly, should not be considering or imposing technology forcing standards that would require design or operational changes. That would be a very radical shift in the balance that Congress struck between these two agencies, and EPA recognized that at Joint Appendix Page 23 where it noted that this would be unprecedented for it to impose design or operational changes as the basis for its standards. So in part, your argument is not that it's just harmonization with international standards, but also with the FAA's domestic responsibilities. Yes, Your Honor. I want to point out that EPA didn't just talk about harmony. It talked about these competitive harms at JA-3 and 22. It talked about the fact that it would be encroaching on the FAA's authority at JA-23. So it's just a bit of a fallacy, this idea that the only thing EPA was considering was international harmony. And international harmony, to be clear, is very important here, and we would echo that. Boeing and other manufacturers need to be able to certify their planes to the international standard. So I see that my time has expired. If there aren't any other questions, I'll conclude. Any questions? Judge Rogers, any questions? Thank you. So in conclusion, we would ask that the Court deny the petition because EPA's choice to set an ICAO equivalent standard locks in the significant progress that this industry has already made in decreasing greenhouse gas emissions and is a fundamentally reasonable choice. Thank you. Thank you. Judge Rowe, you asked about if EPA had ever adopted a divergence from the standards they had for the first 16 years of ICAO's emission standards program. From 1981 to 1997, EPA declined to adopt ICAO standards based on the statutory factors in Section 231. And were the standards that EPA adopted higher than ICAO standards? They were nonexistent. They basically said we don't need to adopt these NOx standards that ICAO adopted because NOx is a problem at airports and the technology is too immature to control it cost effectively. So on that basis they just declined to have a NOx standard for aircraft for that entire 16-year period. In 2001, they also adopted a NOx standard that was more stringent than EPA, than ICAO's standard NOx's route with actual molecule pollutants as a pollutant under aircraft regulations. The EPA mentions the time pressure and the technologies, the amount of data they would need to gather on the technology's applicability to aircraft across different models. They had that. The ICF model that is described in J8-31-33 lists emission reductions associated with every known fuel efficiency technology studied by ICF and it could run that model to see what could those together produce as far as emission reductions. They only used that model to determine that ICAO standards had no cost and no benefit. That's all they used this model for in the three years they had to work with it. The question about international credibility has been answered in Massachusetts versus EPA where the Supreme Court said we're not questioning the executive's prerogative over foreign affairs, but EPA still has to do the job that Congress assigned it. Here, all we're asking is for EPA to base its standards on the Section 231 factors and on the record. What about its argument that here they also have to work with FAA? That FAA has its own standards because it arguably has primary responsibility for many of these issues. Therefore, it's not just about international harmonization, but it's also about making things consistent across executive branch agencies domestically. FAA's duty here under Section 233 is to implement and ensure compliance with the emission standards that EPA promulgates. Certainly, EPA is not mandating certain technologies. It will have certain technologies or measures in mind. So, before in the fuel venting standards adopted in 1973, it had operational measures in mind when it created this emission standard and it left it to FAA to regulate it. I see my time is about to expire. I have a few more points to make. May I briefly conclude? NACDA did consider the statutory factors. They did consider alternatives. It wasn't a more stringent NOx standard because the record did not show that there was an obvious alternative to study, but they did consider in-production standards and they rejected that alternative under the statutory Section 231 factors. That's at 70 FR 69 678 81. In conclusion, I would just ask that the aircraft will be remanded and for reconsideration consistent with Section 231. Thank you. Case is submitted.
judges: Rao, Childs, Rogers